SLATER HERSEY & LIEBERMAN LLP
   A Limited Liability Partnership
MARK K. SLATER, Cal. Bar No. 129742
   mslater@slaterhersey.com
ELISE K. SARA, Cal. Bar No. 253813
   esara@slaterhersey.com
JUANYONG HUANG, Cal. Bar No. 307178
   jhuang@slaterhersey.com
101 California Street, Suite 1075
San Francisco, California  94111
Telephone:      415-294-7700
Facsimile:      949-398-7501

Attorneys for Plaintiff,
BRIGHTPOINT DISTRIBUTION, LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| BRIGHTPOINT DISTRIBUTION, LLC, an Indiana limited liability company,<br><br>              Plaintiff,<br><br>        v.<br><br>ALIPHCOM d/b/a JAWBONE, a California corporation,<br><br>              Defendant. | Case No.<br><br>**COMPLAINT FOR:**<br><br>  **(1) BREACH OF CONTRACT; and**<br>  **(2) EXPRESS CONTRACTUAL INDEMNITY;**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Brightpoint Distribution, LLC, ("Brightpoint"), for its Complaint against Defendant AliphCom d/b/a Jawbone ("Jawbone"), alleges as follows:

## JURISDICTION AND VENUE

1. This Court has subject matter jurisdiction over this action pursuant to 29 U.S.C. §1332 because complete diversity of citizenship exists between Brightpoint and Jawbone, and the damage Jawbone has caused Brightpoint exceeds $75,000.

2. Venue is proper under 28 U.S.C. § 1391(b) in this case because Jawbone is a California corporation headquartered in San Francisco, California.  Jawbone is also subject to personal jurisdiction in California.

## THE PARTIES

3. Brightpoint is, and at all relevant times was, an Indiana limited liability company with its principal place of business and corporate headquarters in Plainfield, Indiana.

4. Brightpoint is a limited liability company with one member, Brightpoint North America L.P. ("BNA LP").  BNA LP is a Delaware limited partnership, and both its limited partner and general partner are Indiana corporations with their principal places of business in Indiana.

5. Jawbone is, and at all relevant times was, a corporation organized under the laws of California with its principal place of business in San Francisco, California.

## FACTUAL BACKGROUND

6. Jawbone describes itself as a world-leader in consumer technology and consumer wearable devices that builds hardware products and software platforms powered by data science. Jawbone also creates wireless speakers and headsets.

7. Jawbone's UP™ system and its UP™ products provide consumers insight into how they sleep, move, and eat.

8. Brightpoint is a consumer electronics distributor.

9. On September 16, 2013, Brightpoint and Jawbone entered into a Distributorship Agreement (the "Agreement").  Pursuant to the Agreement, Brightpoint became a distributor for

COMPLAINT FOR BREACH OF CONTRACT AND
EXRESS CONTRACTUAL INDEMNITY

1   Jawbone product in the United States.  A true and correct copy of the Agreement is attached hereto

2   as Exhibit A.

3        10.     Under the terms of the Agreement, as a distributor, Brightpoint purchased Jawbone

4   product from Jawbone and re-sold the product to authorized customer resellers.

5        11.     Section 3.06 of the Agreement entitles Brightpoint to 4.5% margin on all products

6   Brightpoint sells to its authorized customer resellers.  It provides:

> **Section 3.06.  Purchase Price**.  The prices for the Products,
> together with any discounts applicable thereto, are set forth in
> Quarterly Term Sheets.  All prices are DDP (lncoterms 2010) the
> Destination.  Distributor shall be entitled to a four and one-half
> percent (4.5%) margin.  Margin is defined as Distributor's Customer
> Purchase Order Price to Distributor minus Distributor's Purchase
> Order Price to Supplier.  The mechanism for managing this margin
> will be through the use of pricing on purchase orders.  Margin shall
> be net of any discounts, credits, returns, etc. and shall be applied to
> Distributor's landed cost of the Product, including any freight,
> insurance, duties, taxes or similar fees.

12       12.     Section 3.07 of the Agreement prohibits Jawbone from reducing prices for product

14  without first giving Brightpoint thirty (30) days prior notice of such reduction.  It also entitles

15  Brightpoint to the reduced price for the products existing in Brightpoint's inventory within thirty

16  (30) days of the price reduction.  Section 3.07 provides:

> **Section 3.07.  Price Reductions**.  Supplier reserves the right, in its
> sole discretion, to reduce the prices applicable to the Products.
> Supplier shall give written notice to Distributor of any price change
> at least thirty (30) days prior to the effective date thereof.
> Notwithstanding the foregoing, any Products ordered by Distributor
> or existing in Distributor's inventory within thirty (30) days prior to
> the effective date of such price reduction shall receive the benefit of
> the new price and Supplier shall issue to Distributor a credit to its
> account to reflect such price reduction.  Distributor may use this
> credit at any time, and from time to time, in its sole and absolute
> discretion.

23       13.     Pursuant to Section 3.14 of the Agreement, Brightpoint has the right to return

24  damaged, defective, or non-conforming products, or all products returned by its customer resellers

25  as authorized in the parties' Quarterly Price Sheets ("Quarterly Term Sheets").  Upon such returns,

26  Jawbone is required to give Brightpoint full credit or a full cash refund for the returned products

27  within thirty (30) days of verification of the product return.  Section 3.14 provides in full:

28

COMPLAINT FOR BREACH OF CONTRACT AND
EXRESS CONTRACTUAL INDEMNITY

**Section 3.14.  Damaged, Defective, Nonconforming Delivery or Customer Returns**.  Distributor may return to Supplier all damaged, defective or nonconforming Products or Products returned to Distributor by its Customers as authorized in the Quarterly Price Sheet, for full credit against outstanding orders or invoices, or for a cash refund if there are not orders or invoices then outstanding.  Any credit or refund due Distributor for returned Product(s) shall be equal to Distributor's purchase price of such Product(s), less any discounts or credits previously received.  Supplier shall pay all costs of transportation, reasonable insurance, export and import fees, customs brokerage expenses and similar charges for returns of Products pursuant to this section.  Distributor must request and receive an RMA (Return Material Authorization) prior to returning any Product.  Credit or refund, as applicable, will be issued within thirty (30) days of receipt and verification of the return.

14.     Section 3.15 of the Agreement requires Jawbone to accept returns of products, which are returned by consumers to authorized resellers within the authorized resellers' standard return policies.

15.     Sections 5.01 and 5.02 of the Agreement address Indemnity and Defense.  Under Section 5.01.1, Jawbone is required to indemnify, defend, and hold Brightpoint harmless from "any and all losses, expenses, costs, damages or the like, of whatever nature, which may be incurred by [Brightpoint] as a result of any third party claims or actions for or resulting from: . . . (c) negligent acts or omissions or intentional misconduct or any breach of this Agreement by [Jawbone]."

16.     Under Section 5.02, Jawbone's indemnity obligation includes reasonable attorneys' fees and other costs of defense incurred by Brightpoint.  Section 5.01 and 5.02 are set forth in full as follows:

**Section 5.01.  Indemnity**.

**Section 5.01.1**  Supplier shall indemnify, defend and hold Distributor and/or Distributor's Customers in the Territory and their respective successors and assigns, and such parties respective officers, directors, employees and agents ("Distributor Indemnified Parties") harmless from and against any and all losses, expenses, costs, damages or the like, of whatever nature, which may be incurred by Distributor Indemnified Parties as a result of any third party claims or actions for or resulting from: (a) infringement of patents, copyrights, trademarks or similar proprietary rights under the laws of the Territory that might be brought against the Indemnified Parties in connection with, or as a consequence of, the

-4-
COMPLAINT FOR BREACH OF CONTRACT AND
EXRESS CONTRACTUAL INDEMNITY

sale or use of Products in the Territory, or such other materials supplied by Supplier pursuant hereto, in the Territory; (b) negligence, whether active or passive, or for product liability of whatever specie, including, without limitation, product recalls, claims or actions for strict liability, improper design or breach of warranty, express or implied, in the Territory relating to the sale, furnishing or distribution of any Products in the Territory, (c) negligent acts or omissions or intentional misconduct or any breach of this Agreement by Supplier, or (d) any statement or communication by Supplier that is inconsistent with the end-user warranties for the Products or Product Specifications.

. . .

**Section 5.02**. **Defense Costs; Defense**.  The indemnification set forth in Section 5.01 shall include, without limitation thereto, reasonable attorneys' fees and other costs of defense incurred by an indemnified Party.  The Party with the indemnity obligation ("Indemnifying Party") shall promptly provide the other Party with notice upon its receipt or acknowledgement of such claim.  The Indemnifying Party, at its sole expense, shall defend all such claims and actions against the other Party, whether brought informally or through court or administrative procedures.  The Indemnifying Party shall be given sole control of the litigation or proceeding and the other Party shall provide cooperation as reasonably requested by the Indemnifying Party.  The Indemnifying Party may not settle any claim unless it is a complete settlement and release of the indemnified Party.  No settlement will be entered into by the Indemnifying Party that requires any public statement or any admission of fault or liability of the indemnified Party without the indemnified Party's prior written consent which shall not be unreasonably be withheld or delayed.

## A.    **Returns**

17.    Jawbone and Brightpoint executed written Quarterly Term Sheets supplementing the terms of the Agreement.  Under the written Quarterly Term Sheets between Jawbone and Brightpoint from 2014 through 2016, Jawbone authorized returns from Brightpoint for purchases from authorized resellers by a consumer and returned by the consumer pursuant to the authorized reseller's standard return policy. For these returns, Jawbone was obligated to examine all returned product and report any discrepancies within twelve (12) business days.  After twelve (12) business days, Jawbone waived all rights to report any discrepancies found.

18.    Under Sections 3.14 and 3.15 of the Agreement and the 2014 through 2016 Quarterly Term Sheets, from September 2014 through June 2016, Brightpoint invoiced Jawbone for authorized product returns.  Jawbone materially breached the parties' agreements by failing to

pay or credit Brightpoint the full amount due and owing for these invoiced authorized returns.  As of June 22, 2016, Jawbone had failed to pay Brightpoint approximately $2,627,368.69 for authorized product returns that Brightpoint invoiced to Jawbone.

19.     Brightpoint continues to receive authorized Jawbone product returns from its authorized customer resellers, and Brightpoint therefore believes that the amount Jawbone will owe Brightpoint for authorized returns will continue to grow.

20.     Brightpoint made multiple demands for payment of the invoiced authorized returns, but Jawbone has failed to pay Brightpoint $2,627,368.69 due and owing as of June 22, 2016.

**B.      <u>Margin, MDF, and Other Pass-Through Charges</u>**

21.     From November 2013 to 2016, the parties also made written agreements in addition to the Agreement that required Jawbone to pay Brightpoint for pass-through charges and Market Development Funds ("MDF") to certain authorized customer resellers, including Target, Best Buy, Kohl's, Meijer, and Sam's Club.

22.     Since Brightpoint had a direct accounting relationship with its customer resellers and Jawbone did not, Jawbone used Brightpoint to "pass through" MDF funds and other funds to Brightpoint's customer resellers for special programs, promotions, and rebates offered by Jawbone.  In other words, once Jawbone agreed directly with the resellers to provide funding to the resellers, the resellers would receive such funds through their account with Brightpoint (either by payment or deduction from the reseller's account payable to Brightpoint), and Jawbone would then reimburse Brightpoint (either by payment or deduction from Brightpoint's account payable to Jawbone).

23.     In the parties' Q4 2015 Quarterly Term Sheet, for example, Jawbone agreed to pass through a Returns Consolidation Fee ("RCF") to Brightpoint on authorized returned units, including freight for all authorized product returned by authorized resellers.  Jawbone further agreed to provide pass-through funds of five percent (5%) discount for Electronics and Audio departments upon the opening order for all new Target stores.  Brightpoint invoiced Jawbone

under this agreement for RCF and the Target New Store Discount, but Jawbone has failed to pay in material breach of the parties' contract.

24.     Between February 2015 and May 2016, pursuant to the parties' agreements, Brightpoint invoiced Jawbone for authorized MDF and pass-through charges/funds to authorized customer retailers, including Target, Best Buy, Kohl's, Meijer, and Sam's Club.  Jawbone refused to pay the full amounts due and owing to Brightpoint under these invoices in material breach of the parties' agreements.

25.     Between February 2015 and May 2016, Brightpoint also invoiced Jawbone for authorized margin payments, which Brightpoint is entitled to under Section 3.06 of the Agreement.  Jawbone refused to pay the full amounts due and owing under these invoices in material breach of the parties' agreement.

26.     Brightpoint made multiple demands for payment of the invoiced MDF and pass-through charges/funds, as well as for the margin payments that Jawbone owes Brightpoint, but Jawbone has failed to pay.

27.     As of June 22, 2016, Jawbone failed to pay an approximate total of $2,073,879.83 of invoiced MDF, pass-through charges/funds, and margin payments.

**C.      Jawbone's Unannounced April 2016 Price Reduction**

28.     On or around April 25, 2016, through an email sent by Jawbone's Jake Langner, Brightpoint learned that Jawbone lowered the price of its UP4™, UP3™, UP2™ Rope, and UP2™ Classic products to $24, $24, $15, and $12, respectively.

29.     These lowered prices are significantly lower than the cost at which Brightpoint purchased these same products from Jawbone.  Section 3.07 of the Agreement prohibits Jawbone from reducing product prices without first giving Brightpoint thirty (30) days prior notice.  It also entitles Brightpoint to the reduced price for the products existing in Brightpoint's inventory within thirty (30) days prior to the price reduction.

30.     Jawbone did not give Brightpoint any prior notice of its April 25, 2016 price reductions.  Jawbone's failure to notify Brightpoint as required by Section 3.07 of the Agreement constitutes a material breach of the Agreement.

31.     Brightpoint had approximately 16,936 units of the UP4™, UP3™, UP2™ Rope, and UP2™ Classic products in inventory within thirty (30) days of Jawbone's April 25, 2016 price reduction.  Accordingly, under Section 3.07 of the Agreement, Jawbone owes $1,353,968.53 to Brightpoint as it is required to give Brightpoint the benefit of the new, lowered prices.  Brightpoint has demanded payment of this amount, but Jawbone has failed to respond to Brightpoint's demand.

32.     Additionally, on or around April 12, 2016, Brightpoint sold Jawbone product for $740,213.87—product that it purchased from Jawbone at approximately $1.8 million—to a customer, Digital Data.

33.     Jawbone subsequently breached the Agreement by failing to provide Brightpoint with thirty (30) days prior notice of its April 25, 2016 price reduction for the UP4™, UP3™, UP2™ Rope, and UP2™ Classic products.

34.     Brightpoint sold these products to Digital Data at higher prices than those established by Jawbone's April 25, 2016 price reduction.

35.     Following Jawbone's April 25, 2016 price reduction, Digital Data informed Brightpoint that it will not pay for the $740,213.87 of Jawbone product it ordered and accepted because of the lowered prices for these products in the market.  Digital Data then breached its contract with Brightpoint by failing to pay Brightpoint on or before May 14, 2016 pursuant to the parties' contract.  Brightpoint was forced to file, and did file, a lawsuit against Digital Data for its breach of contract.

36.     Digital Data's refusal to pay Brightpoint is a direct result of Jawbone's breach of Section 3.07 of the Agreement, and Brightpoint is entitled to $740,213.87 in indemnification from Jawbone under the Agreement.  Brightpoint is also entitled to indemnification for all additional costs, losses, expenses, or damages, including attorneys' fees, which Brightpoint has incurred and

will incur as result of its lawsuit with Digital Data and Jawbone's unannounced April 25, 2016 price reduction.

37.     On May 6, 2016, Brightpoint again demanded payment from Jawbone of all amounts due and owing to it under the Agreement, the Quarterly Term Sheets, and the parties' written agreements.  Brightpoint further demanded that Jawbone confirm that it would indemnify, defend, and hold harmless Brightpoint from any and all damages, losses, expenses and costs it may incur in the future as a result of Jawbone's breach of Section 3.07 of the Agreement. Jawbone rejected Brightpoint's demands.

## FIRST CLAIM FOR RELIEF

### (Breach of Contract against Jawbone)

38.     Brightpoint realleges and incorporates by reference the allegations of Paragraphs 1 through 37 of the Complaint set forth above.

39.     Under the Agreement and the parties' Quarterly Term Sheets from 2014 through 2016, Jawbone is obligated to provide a full credit or payment to Brightpoint for purchases from Authorized Resellers by a consumer and returned by the consumer pursuant to the authorized reseller's standard return policy.

40.     Under the parties' contracts, Brightpoint invoiced Jawbone for returns made to authorized resellers by consumers according to the authorized reseller's standard return policy.  As of June 22, 2016, Jawbone had materially breached the parties' agreements by failing to pay Brightpoint approximately $2,627,368.69 for authorized returns.

41.     Under the Agreement, Brightpoint is entitled to a 4.5% margin on the Jawbone products it sells to its authorized customer resellers.  From February 2015 through May 2016, Brightpoint invoiced Jawbone for margin payments, but Jawbone has refused to pay the full amount due and owing under these invoices in material breach of the Agreement.

42.     Under the Term Sheets executed by Jawbone and Brightpoint and written agreements between Jawbone and Brightpoint from November 2013 through 2016, Jawbone agreed to pay Brightpoint for authorized MDF and pass-through funds to customer resellers,

including Target, Best Buy, Kohl's, Meijer, and Sam's Club.  From February 2015 through May 2016, Brightpoint invoiced Jawbone for these payments, but Jawbone has refused to pay the full amount due and owing under these invoices in material breach of the parties' contracts.

43.     As of June 22, 2016, Jawbone failed to pay Brightpoint approximately $2,073,879.83 in invoices for margin payments, authorized MDF, and pass-through funds.

44.     Additionally, under Section 3.07 of the Agreement, Jawbone is obligated to give Brightpoint notice thirty days prior to the effective date of any product price reduction, and to give Brightpoint the benefit of any price reduction for Jawbone product in Brightpoint's inventory within thirty (30) days of the price reduction.

45.     Jawbone breached the Agreement by failing to give Brightpoint any notice of its April 25, 2016 price reduction.  Brightpoint had approximately 16,936 units of Jawbone UP4™, UP3™, UP2™ Rope, and UP2™ Classic products in inventory within thirty (30) days prior to the April 25, 2016 price reduction.  Under Section 3.07 of the Agreement, Jawbone owes $1,353,968.53 to Brightpoint.

46.     Jawbone has refused to pay Brightpoint this $1,353,968.53 in material breach of the Agreement.

47.     Brightpoint has performed all obligations and conditions it was required to perform under the Agreement, the Quarterly Term Sheets, the parties' written agreements regarding MDF and pass-through funds, except for those obligations which have been excused by Jawbone's breaches.  No performance by Jawbone has been excused.

48.     As a direct and proximate result of Jawbone's breaches of contract, Brightpoint has been damaged in the approximate amount of $6,055,217.05, with the exact amount to be proven at trial, plus interest, costs and attorneys' fees.

## SECOND CLAIM FOR RELIEF

### (Express Contractual Indemnity against Jawbone)

49.      Brightpoint realleges and incorporates by reference the allegations of Paragraphs 1 through 48 of the Complaint set forth above.

50.     The express terms of Section 5.01.1 of the Agreement require Jawbone to indemnify, defend, and hold harmless Brightpoint from "any and all losses, expenses, costs, damages or the like, of whatever nature, which may be incurred by [Brightpoint] as a result of any third party claims or actions for or resulting from: . . . (c) negligent acts or omissions or intentional misconduct or any breach of this Agreement by [Jawbone]."  Jawbone's indemnity obligation includes reasonable attorneys' fees and other costs of defense incurred by Brightpoint.

51.     Digital Data's refusal to pay the $740,213.87 for Jawbone product, as well as the costs Brightpoint has incurred and will continue to incur as a result of its lawsuit with Digital Data, were directly caused by Jawbone's breach of Section 3.07 of the Agreement.  As such, Jawbone is obligated to indemnify Brightpoint from all losses, expenses, costs, damages or the like, of whatever nature, incurred by Brightpoint with respect to Digital Data's actions, which were caused by Jawbone's breach of Section 3.07 of the Agreement.

52.     Brightpoint has performed all obligations and conditions it was required to perform under the Agreement, except for those obligations which have been excused by Jawbone's breaches.  No performance by Jawbone has been excused.

53.     As a result of the alleged conduct of Jawbone, Brightpoint has incurred losses to date of approximately $740,213.87, and it will continue to suffer losses through prosecution of its litigation with Digital Data and through prosecution of this litigation, in an exact amount according to proof at the time of trial.

## PRAYER FOR RELIEF

WHEREFORE, Brightpoint prays for judgment as follows:

1.  For damages exceeding $6,055,217.05, in an exact amount to be determined at the time of trial;

2.  For indemnification exceeding $740,213.87, in an exact amount to be determined at the time of trial;

3.  For attorneys' fees as permitted by law, equity or contract, including Section 7.10 of the Agreement;

-11-

COMPLAINT FOR BREACH OF CONTRACT AND
EXRESS CONTRACTUAL INDEMNITY

1      4.  For costs of suit incurred herein;

2      5.  For pre-judgment and post-judgment interest at the maximum rate allowed by law; and

3      6.  For such other and further relief as the Court may deem just and proper.

5  Dated:  July 8, 2016             SLATER HERSEY & LIEBERMAN LLP

8                    By:      */s/Mark K. Slater*

MARK K. SLATER
Attorneys for Plaintiff,
Brightpoint Distribution, LLC

COMPLAINT FOR BREACH OF CONTRACT AND
EXRESS CONTRACTUAL INDEMNITY

1

## **DEMAND FOR JURY TRIAL**

2      Plaintiff Brightpoint Distribution, LLC demands a trial by jury on all claims for which a

3   jury trial is available.

4

5   Dated:  July 8, 2016                                    SLATER HERSEY & LIEBERMAN LLP

6

7

8            By:        _____/s/Mark K. Slater_____
            MARK K. SLATER

9            Attorneys for Plaintiff,
            Brightpoint Distribution, LLC

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-13-

Exhibit A



## DISTRIBUTORSHIP AGREEMENT

THIS DISTRIBUTORSHIP AGREEMENT ("**Agreement**") is made effective as of the $\underline{16^{th}}$ day of September, 2013 ("**Effective Date**"), by and between Brightpoint Distribution, LLC, an Indiana limited liability company, with its principal place of business at 501 Airtech Parkway, Plainfield, Indiana 46168 ("**Distributor**") and AliphCom, a California corporation, doing business as Jawbone, with its principal place of business at 99 Rhode Island Street, 3rd Floor, San Francisco, California 94103 ("**Supplier**"). Distributor and Supplier are sometimes hereinafter referred to individually as a "**Party**" and collectively as the "**Parties**".

**ARTICLE 1**
**DEFINITIONS**

When used in this Agreement, the following terms shall have the respective meanings indicated, such meanings to be applicable to both the singular and plural forms of the terms defined:

**Section 1.01.** "**Affiliate**" means any person, corporation or other entity: (i) which owns, now or hereafter, directly or indirectly, twenty-five percent (25%) or more of any class of the voting stock or membership interest of a Party or is, now or hereafter, directly or indirectly, in effective control of such; or (ii) that owns, now or hereafter, directly or indirectly, twenty-five percent (25%) or more of any class of the voting stock or membership interest of which such Party, or a party described in (i) above, owns, now or hereafter, directly or indirectly, or of which such party, or a party described in (i) above, is, now or hereafter, directly or indirectly, in control. [

**Section 1.02.** "**Agreement**" means this Agreement, and the Exhibits, together with all amendments thereto.

**Section 1.03.** "**Confidential Information**" means the information described in Section 7.01.

**Section 1.04.** "**Customer**" means any party that purchases or leases Products from Distributor.

**Section 1.05.** "**Destination**" means Distributor's facilities located throughout the Territory, including, but not limited to, Plainfield, Indiana, and such other locations as may be changed or added by Distributor with the prior written consent of Supplier, which consent shall not be unreasonably withheld.

**Section 1.06.** "**Exhibit**" means any exhibit attached to this Agreement.

**Section 1.08.** "**Products**" means those items described in **Exhibit A**, as well as any Updates to those, or defined in Quarterly Price Sheets.

**Section 1.09.** "**Proprietary Rights**" means all rights in the Products and Supplier's Confidential Information, including, but not limited to, patents, copyrights, authors' rights, trademarks, tradenames, know-how and trade secrets, irrespective of whether such rights arise under U.S. or international intellectual property, unfair competition or trade secrets law.

**Section 1.10.** "**Purchase Order**" means a written purchase order issued by Distributor to Supplier for the purchase of Products pursuant to this Agreement.

**Section 1.11.** "**Quarterly Price Sheets**" means those quarterly price sheets substantially in the form attached hereto as **Exhibit D** to be mutually agreed and executed by the Parties on a quarterly basis setting forth the applicable Products, pricing and Customers.

**Section 1.12.** "**Sales Incentives**" means those certain sales incentives, rebates and credits, if any, as set forth in **Exhibit A**.

**Section 1.13.** "**Specifications**" means those specifications for the Products published by the Supplier.

**Section 1.14.** "**Territory**" means the geographic area or areas described in **Exhibit B** attached hereto as may be modified or otherwise agreed in writing by the Parties.

**Section 1.15.** "**Trademark**" means any trademark, logo, service mark or other commercial designation, whether or not registered, used to represent or describe the Products of Supplier, as set forth in **Exhibit C**.

**Section 1.16.**     "**Updates**" means new versions, including maintenance releases, and localizations and translations thereof, of a Product that contain bug fixes, error corrections and minor enhancements, but not containing major enhancements or significant new functionality, as determined in Supplier's sole reasonable discretion, and any related documentation.

**Section 1.17.**     "**Upgrades**" means new versions of a Product that contain major enhancements and significant new functionality, including localizations and translations thereof, as determined in Supplier's sole reasonable discretion, and any related documentation.

### ARTICLE 2
### APPOINTMENT OF DISTRIBUTOR

**Section 2.01.**     **Appointment.**  Supplier hereby appoints Distributor as Supplier's non-exclusive distributor of Products in the Territory and Distributor accepts that position, subject to the terms and conditions of this Agreement.  Supplier may appoint other distributors to sell, or solicit sales of, some or all of the Products to customers in the Territory.  Supplier may: (a) directly sell, or solicit sales of, Products to customers in the Territory; (b) investigate and resolve complaints from customers in the Territory; (c) distribute sales and advertising information to customers in the Territory; and (d) perform any such other services in the Territory Supplier deems necessary.  Notwithstanding the foregoing, and only for such time as a Quarterly Price Sheet is in effect, for authorized Customers as documented on Quarterly Price Sheets, Distributor shall be the exclusive distributor for the Territory and Supplier shall not appoint any other distributor in the Territory with respect to such Customers or expressly grant any other distributor the right to sell the Products to such Customers in the Territory.  In the event of any conflict or inconsistency in the terms of this Agreement and a Quarterly Term Sheet, this Agreement shall control.

**Section 2.02.**     **Relationship of Parties.**  Distributor shall be entitled, during the term of this Agreement and any extension thereof, to advertise and hold itself out as an authorized distributor of the Products.  Nothing contained in this Agreement shall be deemed to create any partnership or joint venture relationship between the Parties.  Distributor is an independent contractor and is not the legal representative or agent of Supplier for any purpose and shall have no right or authority (except as expressly provided in this Agreement) to incur, assume or create in writing or otherwise, any obligations over Supplier or its employees.

**Section 2.03.**     **Advertising and Marketing.**  At all times during the term of this Agreement and any extension thereof, Distributor shall be entitled to use, in accordance with Supplier's trademark usage guidelines and upon Suppliers written consent, the Trademarks in all of its advertisements for the Products and other reasonable activities conducted by Distributor to promote the sale of the Products.  Distributor shall submit examples of all proposed advertisements and other promotional materials for the Products to Supplier for inspection and Distributor shall not use any such advertisements and promotional materials without Supplier's written consent, which shall not be unreasonably withheld or delayed.  At no time during or after the term of this Agreement will Distributor challenge or assist others to challenge the Trademarks or the registration thereof, or attempt to register any trademarks, marks or trade names confusingly similar to those of Supplier.  Distributor will not remove or conceal any copyright or other proprietary notices incorporated on or in the Products by Supplier.  Upon termination of this Agreement for any reason, except for the sole purpose of selling any Products remaining in Distributor's inventory, Distributor shall immediately cease all use of the Trademarks.

**Section 2.04.**     **Proprietary Rights.**  Supplier and Distributor acknowledge and agree that Supplier owns all of the Proprietary Rights.  The use by Distributor of the Proprietary Rights is authorized only for the purposes herein set forth and upon termination of this Agreement, for any reason, such authorization will cease.

**Section 2.05.**     **New Products and Upgrades.**  If Supplier now or hereafter commercially manufactures or distributes, or proposes to commercially manufacture or distribute, any product which is utilized in wireless communications, other than the Products, or any Upgrades to the Products, Supplier shall, as soon as reasonably possible, notify Distributor of that fact and of all details concerning that product or that Upgrade.  Distributor may request from Supplier distribution rights for that product or that Upgrade in the Territory, or any portion thereof, and if so requested, Supplier shall, with respect to any such other products or Upgrades that are generally commercially available from Supplier, grant such distribution rights to Distributor on terms and conditions no less favorable than those provided in this Agreement.  Supplier shall first make that offer in writing to Distributor on terms and conditions which shall be specified fully in that offer.  That offer shall contain a full description of the subject product or Upgrade and its specifications and pricing.  Distributor may request, and Supplier shall promptly provide further information concerning the product, the Upgrade, or the offer.  Supplier's ability to offer the product or Upgrade to another party for distribution in the Territory shall not be conditioned on Distributor's acceptance or rejection of such an offer to distribute the products or Upgrade.

**Section 2.06.**     **Customization and Configuration.**  Distributor shall be entitled with written authorization from Supplier to and is hereby authorized to configure and customize all Products and to make use of any tools Supplier makes available

or authorized in that process for the benefit of end customers. Supplier authorizes Distributor to configure and customize Products in accordance with agreements with its Customers. Accordingly, Supplier shall actively co-operate with Distributor in all respects to facilitate customization of Products and provide Distributor with such information, responses, solutions, approvals and documentation as is reasonably required to meet the Customers' end users' needs. Additionally, Supplier shall support Distributor with software tools, other tools, necessary information and such dedicated resources as are necessary for them to perform any upgrades, updates, customization, configuration, or similar actions to enable Distributor to fulfill Customers' requirements and needs in a timely manner. Distributor shall safeguard such tools and information in accordance with the mutually agreed terms and conditions.

**Section 2.07.**    **Training.**    From time to time Supplier shall provide or make available to Distributor adequate training to enable Distributor to effectively market, distribute and sell the Products. Such training shall be conducted with a frequency and at the locations as the Parties may mutually agree. The parties will mutually agree to the allocation of any travel costs incurred by Supplier for such training, but online training will be without charge to Distributor.

## ARTICLE 3
## TERMS OF PURCHASE AND SALE OF PRODUCTS

**Section 3.01.**    **Purchase of Product and Forecast of Demand.**    Distributor may, but shall not have the obligation to, purchase from time to time Products from Supplier. Distributor agrees to furnish Supplier with a non-binding, rolling twelve-month Product forecast, mutually reasonably agreed between Supplier and Distributor, indicating, on a month-by-month basis, the quantities of each type of Product Distributor expects to purchase and the desired date (the "**Delivery Date**") by which the Products are to be delivered to the Destination (the "**Product Forecast**"). Distributor shall use commercially reasonable efforts to ensure that the Product Forecasts accurately represent Distributor's Product needs. Such Product Forecasts shall not be considered firm orders unless followed by a specific Purchase Order from Distributor and Distributor shall have no liability to Supplier for failing to provide such Product Forecasts.

**Section 3.02.**    **Purchases for Resale.**    All Products purchased by Distributor shall be purchased solely for commercial resale.

**Section 3.03.**    **Order Procedure.**    Distributor shall submit to Supplier Purchase Orders for the Products at least eight (8) to ten (10) weeks depending on Product. Each Purchase Order Distributor issues to Supplier under this Agreement shall be in writing, identify that it is a Purchase Order and shall further set forth the delivery date or dates and the description and quantity of Products which are to be delivered on each of such dates. The individual contracts for the sale of Products formed by the Purchase Orders shall automatically incorporate, to the extent applicable, the terms and conditions of this Agreement. Notwithstanding anything to the contrary provided in this Section 3.03, Supplier and Distributor may, by written amendment signed by officers of each party, modify the terms and conditions of this Agreement.

**Section 3.04.**    **Issuance and Acceptance of Purchase Orders.**    Supplier shall notify Distributor of its acceptance or rejection of a Purchase Order within five (5) business days after Supplier's receipt of the Purchase Order. Supplier may accept all Purchase Orders that comply with the terms of this Agreement and are consistent with Distributor's Product Forecasts, such forecasts having been mutually reasonably agreed between Supplier and Distributor pursuant to Section 3.01. Notice of acceptance shall include confirmation of requested quantities, dates and prices, consistent with the terms of this Agreement. Supplier shall use commercially reasonable efforts to accommodate any changes to previously accepted Purchase Orders. Orders must be in full pallet quantities. Supplier and Distributor agree that any pre-printed terms or conditions in any Purchase Order, invoice, or order confirmation or any similar documents that are inconsistent with or in addition to the terms and conditions in this Agreement shall be of no force or effect and neither party shall be obligated in any way by such terms.

**Section 3.05.**    **Cancellation of Orders.**    Distributor may cancel any Purchase Order more than thirty (30) days prior to the confirmed delivery date. Distributor may not cancel any Purchase Order less than thirty (30) days before the confirmed Supplier specified delivery date. All cancellations of Purchase Orders by Distributor shall be in writing, or if not initially in writing, shall be confirmed in writing. If Distributor cancels a Purchase Order that has been accepted by Supplier at any time within thirty (30) days before the specified delivery date, Distributor shall reimburse Supplier for any actual and reasonable expenses incident to such Purchase Order incurred by Supplier prior to the time it was informed of the cancellation.

**Section 3.06.**    **Purchase Price.**    The prices for the Products, together with any discounts applicable thereto, are set forth in Quarterly Term Sheets. All prices are DDP (Incoterms 2010) the Destination. Distributor shall be entitled to a four and one-half percent (4.5%) margin. Margin is defined as Distributor's Customer Purchase Order Price to Distributor minus Distributor's Purchase Order Price to Supplier. The mechanism for managing this margin will be through the use of pricing on purchase orders. Margin shall be net of any discounts, credits, returns, etc. and shall be applied to Distributor's landed cost of the Product, including any freight, insurance, duties, taxes or similar fees.

**CONFIDENTIAL & PROPRIETARY**
**COPYRIGHT, UNPUBLISHED, BRIGHTPOINT, INC.**
*The language contained in and the format of this agreement shall not be copied or duplicated, in whole or in part, either identically or substantially similar expression, without the express written consent of BrightPoint, Inc.*

Jawbone Distributor Agmt IMM FINAL (Ex) 05Sep13 .docx

For purposes of illustration and not limitation:

|  | $ | % |
|---|---|---|
| Distributor's Customer Purchase Order Price to Distributor | $ 100.00 | 100.0% |
| Distributor's Purchase Order Price to Seller | $ 95.50 | 95.5% |
| Margin | $ 4.50 | 4.5% |

**Section 3.06.1   Volume Incentive Pricing.**   During any calendar year of the term, Supplier shall be entitled to a rebate, as described herein, if Distributor's purchases of Product reach one hundred million dollars ($100,000,000) net of returns ('Rebate Threshold').   Supplier's rebate shall be equal to one half of one percent (0.5%) of Distributor's total Product purchases net of returns ('Rebate'). For purposes of calculating the Rebate Threshold and the Rebate all purchases of Distributor, including any Product purchases by any entity affiliated with Distributor will be applied to the calculation.   At such time as Distributor's Product purchases reach the Rebate Threshold, Supplier shall invoice Distributor for the Rebate retroactive to January 1 of the calendar year in which the Rebate Threshold was met.   Thereafter, for the remainder of the calendar year in which the Rebate Threshold was met, Supplier shall invoice Distributor on a calendar monthly basis for the Rebate.   In the subsequent calendar year, the Rebate will not be payable until Distributor again reaches the Rebate Threshold.   For purposes of illustration only, if on June 30 of calendar year 2014, Distributor reaches the Rebate Threshold, Supplier will invoice Distribute for the Rebate on Distributor's total Product purchases from January 1, 2014 until June 30, 2014.   Thereafter, on a calendar monthly basis, Supplier will invoice Distributor for the Rebate based on Distributor's Product purchases for each previous calendar month until December 31, 2014.   Beginning January 1, 2015, Distributor's Product purchases will accrue to a new Rebate Threshold and no Rebate will be due Supplier in 2015 until Distributor's Product purchases reach the Rebate Threshold.

**Section 3.07.        Price Reductions.**  Supplier reserves the right, in its sole discretion, to reduce the prices applicable to the Products.   Supplier shall give written notice to Distributor of any price change at least thirty (30) days prior to the effective date thereof.   Notwithstanding the foregoing, any Products ordered by Distributor or existing in Distributor's inventory within thirty (30) days prior to the effective date of such price reduction shall receive the benefit of the new price and Supplier shall issue to Distributor a credit to its account to reflect such price reduction.  Distributor may use this credit at anytime, and from time to time, in its sole and absolute discretion.

**Section 3.08.        Packing.**  Supplier shall, at its expense, pack all Products in accordance with Supplier's standard packing procedure, which shall be suitable to permit shipment of the Products to the Territory without damage.; provided, however, that if Distributor requests a modification of those procedures, Supplier shall make the requested modification and Distributor shall bear any reasonable expenses incurred by Supplier in complying with such modified procedures which are in excess of the expenses which Supplier would have incurred in following its standard procedures.

**Section 3.09.        Delivery; Title and Risk of Loss.**  All deliveries of Products sold by Supplier to Distributor pursuant to this Agreement shall be made DDP (Incoterms 2010) the Destination, and title to and risk of loss of Products shall pass from Supplier to Distributor at the Destination.   Supplier agrees to comply with Distributor's written inbound shipping specifications and routing guide.

**Section 3.10.        Inspection and Acceptance.**  Promptly upon the receipt of a shipment of Products, Distributor shall inspect the shipment for patently visible shortages, defects, damage or nonconformance with Purchase Order specifications. Within five (5) business days of receipt of the shipment, Distributor shall notify Supplier in writing of any patently visible shortages, defects, damage or nonconformance with Purchase Order specifications that Distributor claims existed at the time of delivery.  Supplier shall acknowledge receipt of such notices within two (2) business days.  Distributor shall quarantine the Products for a period not to exceed two (2) weeks.  Within the two (2) week period, Supplier shall present a plan for recovery and remedy of the issues.   If Supplier fails to provide a reasonable recovery and remedy plan within the two (2) week quarantine period, Distributor may return the Products at Supplier's sole cost and expense for credit. Supplier shall ensure that the recovery and remedy plan is completed and deliver to Distributor within thirty (30) days once the recovery and remedy plan is in place a quantity of conforming Products to replace any that were in short supply, defective, damaged or not conforming with Purchase Order specifications at the time of delivery unless the Parties mutually agree that the conforming Products may be delivered as part of the next scheduled delivery.   Notwithstanding the foregoing, nothing herein shall be deemed to relieve Supplier of any of its obligations in respect of warranty, epidemic failure, critical issues or after sales service.

**Section 3.11.        Payment.**  Upon delivery and acceptance of Products, Supplier will submit to Distributor Supplier's written invoice for those Products, which shall automatically incorporate, to the extent applicable, the terms and conditions of this Agreement.  Any terms or conditions inconsistent with the terms and conditions set forth in this Agreement shall be considered null and void and of no force or effect.   Payment terms are 2% 10 Net 30.   Distributor shall pay each undisputed

*CONFIDENTIAL & PROPRIETARY*
*COPYRIGHT, UNPUBLISHED, BRIGHTPOINT, INC.*
*The language contained in and the format of this agreement shall not be copied or duplicated, in whole or in part, either identically or substantially similar expression, without the express written consent of BrightPoint, Inc.*

Jawbone Distributor Agmt IMM FINAL (Ex) 05Sep13 .docx

invoice within thirty (30) days after Supplier's date of that invoice. In the event that Distributor pays any amount hereunder within ten (10) days of date of invoice, Distributor shall be entitled to an early pay discount of two percent (2%) of the amount owed. Payment shall be made in United States dollars and wired to a bank account pursuant to written instructions provided by Supplier to Distributor. Distributor will make no deductions of undisputed amounts from invoice. In the event any provisions of a Quarterly Term Sheet or other written agreement with Supplier requires that Supplier grant credits to Distributor's account, Supplier shall grant such credit to Distributor's account. Distributor or Supplier may not issue debit or credit memos to Supplier or Distributor or otherwise deduct from or offset against any amounts due from Distributor to Supplier, without the prior written consent of Supplier or Distributor of which written consent may be given by electronic mail.

**Section 3.12**      **Disputed Invoices or Payments.** In the event either party reasonably and in good faith disputes any fee(s) set forth on any invoice or record of payment, that party must notify the other in writing, setting forth the reasons for and the amount of such dispute (a "Dispute Notice"), reasonably promptly following discovery. Any undisputed portion of an invoice shall be paid no later than thirty (30) days following the date of the invoice or record of payment. Upon receipt of a Dispute Notice, both Parties will promptly make available appropriate personnel to work in good faith to resolve the dispute within ten (10) days. Upon resolution of the dispute by the Parties, additional agreed amounts due from a Party, if any, in relation to the applicable invoice must be remitted to the other within ten (10) business days following such resolution. If the dispute remains unresolved sixty (60) days after the date of the invoice or document at issue, either Party may declare its position that the other party is in breach of this Agreement and pursue any or all remedies available to it.

**Section 3.13.**      **Product Returns; Stock Balancing.** Supplier does not grant Distributor any stock balancing or stock rotation rights unless expressly set forth in a Quarterly Term Sheet. Under no circumstances shall Distributor resell or distribute, or permit its subcontractors, if any, to resell or distribute, Products returned by any end user or purchaser. Distributor will use commercially reasonable efforts to promptly notify Supplier if it learns of any subcontractor or any third party selling or distributing any used or returned Products. In the event that an excess or obsolete inventory situation exists, to the extent not addressed in a Quarterly Term Sheet, Supplier and Distributor agree to work together to establish a mutual action plan. Supplier's sole and exclusive remedy for Distributor's failure to comply with this Section 3.13 shall be termination of this Agreement.

Stock Rotation. Once per quarter, Distributor shall be allowed a two percent (2%) stock rotation based upon the total dollar amount of Product purchased in the prior quarter. To initiate a stock rotation, Distributor will obtain an RMA from Supplier and shall at Distributor expense return Product to a U.S location to be chosen by Supplier. As a requirement prior to issuance of an RMA, Distributor shall first provide to Supplier a purchase order for offsetting Product of equal value to the Product subject to stock rotation. Supplier will issue a credit to Distributor's then current accounts receivable upon receipt of the Product on the RMA and will then ship the Product on the offsetting purchase order. For example, if prior quarter purchases were $100,000. Distributor would be eligible for stock balancing for Products with a total value of $2,000 ($100,000 X 2.0% = $2,000).

**Section 3.14**      **Damaged, Defective, Nonconforming Delivery or Customer Returns.** Distributor may return to Supplier all damaged, defective or nonconforming Products or Products returned to Distributor by its Customers as authorized in the Quarterly Price Sheet, for full credit against outstanding orders or invoices, or for a cash refund if there are not orders or invoices then outstanding. Any credit or refund due Distributor for returned Product(s) shall be equal to Distributor's purchase price of such Product(s), less any discounts or credits previously received. Supplier shall pay all costs of transportation, reasonable insurance, export and import fees, customs brokerage expenses and similar charges for returns of Products pursuant to this section. Distributor must request and receive an RMA (Return Material Authorization) prior to returning any Product. Credit or refund, as applicable, will be issued within thirty (30) days of receipt and verification of the return.

**Section 3.15.**      **Customer Satisfaction Returns.** Supplier agrees to accept returns of Products returned to Distributor which are returned by consumers within Customer's standard return policy. Distributor will follow RMA process described in Section 3.14.

**ARTICLE 4**
**WARRANTIES**

**Section 4.01.**      **Warranty.** Supplier shall honor the terms of Supplier's end-user warranty, a copy of which is attached hereto as **Exhibit E**. Supplier represents and warrants that each Product, and its accompanying labeling, packaging, and instructions for use, sold to Distributor shall: (a) at the time of delivery, be new Products; (b) be free from any defects in design, workmanship or materials; (c) conform to all of the Specifications and shall perform in the manner described in the Specifications; and (d) comply with all applicable laws, regulations, rules, ordinances and orders and meet all required statutory, governmental, judicial, regulatory and industry standards, requirements and orders, including maximum RF emission and SAR levels and labeling or warning requirements, whether federal, state or local in the Territory, and Supplier has on-going quality control processes to ensure compliance therewith. Supplier represents and warrants that the Products, any other materials supplied by Supplier pursuant hereto and the Trademarks and designs used in connection

*CONFIDENTIAL & PROPRIETARY*
*COPYRIGHT, UNPUBLISHED, BRIGHTPOINT, INC.*
*The language contained is and the format of this agreement shall not be copied or duplicated, in whole or in part, either identically or substantially similar expression, without the express written consent of BrightPoint, Inc.*

therewith shall not infringe, under the laws of the Territory, any patent, copyright, trademark or other similar proprietary right in the Territory.

**Section 4.02.** **Health and Safety Laws.** Supplier hereby represents and warrants that each Product shall, at Supplier's option, either (a) contain, on the outside surface of all exposed power cords, cables, or wires, no more than 300 parts per million of lead, by weight; or (b) be accompanied by the following warning label: "WARNING: The cord(s) on this product contain(s) lead, a chemical known to the State of California to cause birth defects or other reproductive harm. Wash hands after handling." If Supplier elects to utilize option a) above, Supplier upon reasonable notice shall make available to Distributor a written declaration verifying that the lead content of the Product cords, cables, or wires does not exceed 300 parts per million, using a testing method of sufficient sensitivity to establish a limit of quantification (as distinguished from detection) of less than 300 parts per million. If Supplier elects to utilize option (b) above, the warning shall appear in the same section of the label that contains other safety information, if any, or near its displayed price and/or UPC code. Moreover, the word "WARNING" shall appear in all capital letters and in bold typeface, and the hand-washing admonition shall be in bold and italicized typeface. If space does not permit the warning to be inserted into the label, it shall be prominently affixed to each Product unit itself or to each Product unit packaging. Type shall be similar in size to that used to convey other important information regarding use of the Product.

**Section 4.03.** **Replacement of Defective Products.** For product returned in accordance with Section 3.14, a credit or a cash refund if there are not orders or invoices then outstanding will be issued in accordance with RMA process also detailed in Section 3.14.

**Section 4.04.** **Software Fixes.** Supplier shall make available and be responsible for providing to Customers any required software fixes for the Products, and Distributor shall have no responsibility therefor.

**Section 4.05.** **Product Recalls.** In the event Products must be recalled as required by authorities for any reason, Supplier shall coordinate and bear the costs for the recalls and indemnify the Indemnified Parties in accordance with Section 5.01 for any losses, expenses, costs, damages or the like; provided, however, that Distributor shall cooperate with Supplier and provide Supplier with reasonable assistance in determining the possible location of Products.

**Section 4.06.** **Disclaimer of Warranties.** EXCEPT AS EXPRESSLY WARRANTED IN THIS AGREEMENT, SUPPLIER HEREBY DISCLAIMS ALL WARRANTIES, WHETHER EXPRESS, STATUTORY OR IMPLIED, APPLICABLE TO PRODUCTS, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR THAT ANY PRODUCT IS DELIVERED FREE OF CLAIMS OF THIRD PARTIES BY WAY OF INFRINGEMENT OR THE LIKE.

**ARTICLE 5**
**LIABILITY AND INDEMNITY**

**Section 5.01.** **Indemnity.**

    **Section 5.01.1** Supplier shall indemnify, defend and hold Distributor and/or Distributor's Customers in the Territory and their respective successors and assigns, and such parties respective officers, directors, employees and agents ("**Distributor Indemnified Parties**") harmless from and against any and all losses, expenses, costs, damages or the like, of whatever nature, which may be incurred by Distributor Indemnified Parties as a result of any third party claims or actions for or resulting from: (a) infringement of patents, copyrights, trademarks or similar proprietary rights under the laws of the Territory that might be brought against the Indemnified Parties in connection with, or as a consequence of, the sale or use of Products in the Territory, or such other materials supplied by Supplier pursuant hereto, in the Territory; (b) negligence, whether active or passive, or for product liability of whatever specie, including, without limitation, product recalls, claims or actions for strict liability, improper design or breach of warranty, express or implied, in the Territory relating to the sale, furnishing or distribution of any Products in the Territory, (c) negligent acts or omissions or intentional misconduct or any breach of this Agreement by Supplier, or (d) any statement or communication by Supplier that is inconsistent with the end-user warranties for the Products or Product Specifications.

    **Section 5.01.2** Distributor shall indemnify, defend and hold Supplier and its Affiliates, successors and assigns, and such parties respective officers, directors, employees and agents ("**Supplier Indemnified Parties**") harmless from and against any and all losses, expenses, costs, damages or the like, of whatever nature, which may be incurred by Supplier Indemnified Parties as a result of any third party claims or actions for or resulting from (a) Distributor's negligent acts or omissions or intentional misconduct or any breach of this Agreement, or (b) any statement or communication by Distributor that is inconsistent with the end-user warranties for the Products or Product Specifications.

**Section 5.02.** **Defense Costs; Defense.** The indemnification set forth in Section 5.01 shall include, without limitation thereto, reasonable attorneys' fees and other costs of defense incurred by an indemnified Party. The Party with the indemnity obligation ("**Indemnifying Party**") shall promptly provide the other Party with notice upon its receipt or acknowledgment of such claim. The Indemnifying Party, at its sole expense, shall defend all such claims and actions

***CONFIDENTIAL & PROPRIETARY***
***COPYRIGHT, UNPUBLISHED, BRIGHTPOINT, INC.***
*The language contained in and the format of this agreement shall not be copied or duplicated, in whole or in part, either identically or substantially similar expression, without the express written consent of BrightPoint, Inc.*

Jawbone Distributor Agmt IMM FINAL (Ex) 05Sep13 .docx

against the other Party, whether brought informally or through court or administrative procedures. The Indemnifying Party shall be given sole control of the litigation or proceeding and the other Party shall provide cooperation as reasonably requested by the Indemnifying Party. The Indemnifying Party may not settle any claim unless it is a complete settlement and release of the indemnified Party. No settlement will be entered into by the Indemnifying Party that requires any public statement or any admission of fault or liability of the indemnified Party without the indemnified Party's prior written consent which shall not be unreasonably be withheld or delayed.

**Section 5.03.** **Limitation.** EXCEPT WITH RESPECT TO OBLIGATIONS TO INDEMNIFY PURSUANT TO SECTION 5.01 OR 5.02, AND BREACHES BY EITHER PARTY OF SECTION 7.01, IN NO EVENT, WHETHER FOR BREACH OF CONTRACT, WARRANTY, VENDOR'S NEGLIGENCE, STRICT LIABILITY IN TORT, OR OTHERWISE, SHALL EITHER PARTY BE LIABLE FOR ANY SPECIAL, INCIDENTAL, CONSEQUENTIAL, INDIRECT OR PUNITIVE DAMAGES (INCLUDING LOST REVENUES OR PROFITS) OF ANY KIND DUE TO ANY CAUSE, REGARDLESS OF WHETHER SUCH PARTY HAS BEEN ADVISED OR IS AWARE OF THE POSSIBILITY OF SUCH DAMAGES. THESE LIMITATIONS SHALL APPLY NOTWITHSTANDING THE FAILURE OF THE ESSENTIAL PURPOSE OF ANY LIMITED REMEDY SPECIFIED HEREIN.

**ARTICLE 6**
**TERM AND TERMINATION**

**Section 6.01.** **Term.** This Agreement shall be effective for an initial term of one (1) calendar year from the Effective Date ("**Initial Term**"). The term of the Agreement shall automatically extend for successive periods of one (1) year thereafter unless either Party provides the other Party with written notice of its intention not to extend the term of this Agreement at least sixty (60) days prior to the expiration of the then current term.

**Section 6.02.** **Termination.**

(a)      Either Party may terminate this Agreement at any time, without cause, by mailing written notice of such termination to the other Party not less than ninety (90) days prior to the effective date of such termination.

(b)      Either Party may terminate this Agreement, effective upon the delivery of written notice of such termination to the other Party, if: (i) the other Party becomes insolvent, is generally not paying its debts as such debts become due, makes an assignment for the benefit of creditors, is the subject of any voluntary or involuntary case commenced under the federal bankruptcy laws, as now constituted or hereafter amended (which, in the case of involuntary bankruptcy, is not dismissed within 60 days), or of any other proceeding under other applicable laws of any jurisdiction regarding bankruptcy, insolvency, reorganization, adjustment of debt or other forms of relief for debtors, has a receiver, trustee, liquidator, assignee, custodian or similar official appointed for it or for any substantial part of its property, or is the subject of any dissolution or liquidation proceeding; or (ii) there is a continued and material breach by the other Party of any of the terms and conditions of this Agreement, provided that the Party not at fault has given the other Party thirty (30) days prior written notice of such breach, and if such breach is capable of cure, such other Party has not remedied the breach.

(c)      Either Party may terminate this Agreement as set forth in Section 7.02.

(d)      Prior to the effective date of termination of this Agreement, all of the terms and conditions of, and the respective rights and obligations of the Parties to, this Agreement will remain completely valid and enforceable. These include, without limitation, Distributor's right to order Products from Supplier and to have those orders accepted up to such effective date of termination, even though Supplier's actions taken with respect to such orders may take place after termination.

(d)      The failure of either Party to terminate this Agreement or any extension thereof upon the occurrence of any event described in Section 6.02(b), shall not constitute a waiver of such Party's right to terminate this Agreement or any extension thereof upon any subsequent occurrence of any of those events.

**Section 6.03.** **Effect of Termination.**

(a)      Upon the expiration or termination of this Agreement or any extension thereof for any reason, Distributor shall promptly: (i) return to Supplier, at Distributor's expense, all advertising and promotional materials, sales aids, written technical materials, engineering, maintenance and operation manuals, drawings, plans, specifications and all other documents supplied by Supplier which are not required in the servicing of the Products purchased by Distributor prior to the termination or expiration date; and (ii) desist from advertising and holding itself out as an authorized Distributor of the Products.

*CONFIDENTIAL & PROPRIETARY*
*COPYRIGHT, UNPUBLISHED, BRIGHTPOINT, INC.*
*The language contained in and the format of this agreement shall not be copied or duplicated, in whole or in part, either identically or substantially similar expression, without the express written consent of BrightPoint, Inc.*

(b)    Following the expiration or termination of the distributorship created by this Agreement or any extension thereof, Supplier and Distributor shall perform all contracts for sale of Products executed between them prior to such expiration or termination.

(c)    Notwithstanding anything to the contrary in this Agreement, no expiration or termination of this Agreement by either Party shall affect any rights or obligations of either Party: (i) which are vested pursuant to this Agreement as of the effective date of such expiration or termination; or (ii) which are pursuant to ARTICLE 4 of this Agreement (with respect to Products still under warranty) or ARTICLE 5.  Any other provisions that by their sense and context are intended to survive completion of performance, expiration or termination of this Agreement shall survive.

**Section 6.04.**    **Nonexclusive Remedy.**  The right of either Party to terminate is not an exclusive remedy, and either Party shall be entitled, under appropriate circumstances, alternatively or cumulatively, to damages for breach of this Agreement, to an order requiring performance of the obligations of this Agreement, or to any other remedy available under the laws of any applicable jurisdiction.

**ARTICLE 7**
**GENERAL**

**Section 7.01.**    **Confidential Information.**  In performance of this Agreement, it may be necessary or desirable for either Party to disclose to the other certain business and/or technical information which the disclosing Party regards as proprietary or confidential (the "**Confidential Information**").  Each Party shall treat as confidential all Confidential Information of the other Party and shall not use such Confidential Information except as may be expressly set forth in a Nondisclosure Agreement entered into between the Parties, which, if existing, is incorporated herein by reference, and the effectiveness of which the Parties hereby expressly ratify.  Notwithstanding anything herein or in a Nondisclosure Agreement to the to the contrary, Distributor may disclose the Customer Beneficiary Terms (as defined below) to Distributor's customers.

**Section 7.02.**    **Force Majeure.**  Neither Party shall be liable for any delay or failure to perform hereunder due to floods, riots, strikes, freight embargoes, epidemics, quarantine restrictions, severe weather, acts of God, acts of war, terrorism, acts of public enemies, or hostilities of any nature, laws or regulations of any government (whether foreign or domestic, federal, state, county or municipal) or any other similar cause beyond the reasonable control of the Party affected.  A Party relying on such an event to excuse its performance hereunder shall immediately notify the other Party in writing of the nature of that event and the prospects for that Party's future performance and shall thereafter, while that event continues, respond promptly and fully in writing to all requests for information from the other Party relating to that event and those prospects.  If performance by either Party is delayed more than thirty (30) days due to such event or series of events, and commercially reasonable efforts have not been undertaken within that time to remedy the situation, the other Party may rescind any outstanding orders and terminate this Agreement, effective immediately, without liability.

**Section 7.03.**    **Waivers and Amendments.**  The delay or failure by either Party to exercise or enforce any of its rights under this Agreement shall not constitute or be deemed a waiver of that Party's right thereafter to enforce those rights, nor shall any single or partial exercise of any such right preclude any other or further exercise thereof or the exercise of any other right.  No amendment or waiver of any provision of this Agreement shall be effective unless it is in writing and signed by the Party against which it is sought to be enforced.

**Section 7.04.**    **Severability.**  If any provision of this Agreement is held to be void, the remaining provisions shall remain valid and shall be construed in such a manner as to achieve their original purposes in full compliance with the applicable laws and regulations.

**Section 7.05.**    **Entire Understanding.**  This Agreement is intended to be the sole and complete statement of the obligations and rights of the Parties as to all matters covered by this Agreement, and supersedes all previous understandings, agreements, negotiations and proposals relating thereto, including, without limitation, that certain Distributorship Agreement, dated February 23, 2006, by and between the Parties ("**Prior Agreement**"); provided, however, that any terms or provisions of the Prior Agreement that are designated therein as surviving the termination thereof, shall so survive.  For the avoidance of doubt, this Agreement shall not supersede or replace that certain Ingram Micro Consumer Electronics Program Agreement by and between Supplier and Ingram Micro Consumer Electronics, dated April 9, 2012.

**Section 7.06.**    **Successors and Assigns; Assignment.**  This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and assigns.  Neither Party may assign this Agreement without the prior written consent of the other Party not to unreasonably be withheld or delayed.  Except, however, each party may assign or transfer any or all of its rights or delegate its obligations under this Agreement to any successor, including, without limitation, any successor firm or entity in connection with a merger, consolidation, or sale of all or substantially all of its assets, stock or other equity interests with or to such firm or entity, or to any other firm or entity capable of performing its

*CONFIDENTIAL & PROPRIETARY*
*COPYRIGHT, UNPUBLISHED, BRIGHTPOINT, INC.*
*The language contained in and the format of this agreement shall not be copied or duplicated, in whole or in part, either identically or substantially similar expression, without the express written consent of BrightPoint, Inc.*

Jawbone Distributor Agmt IMM FINAL (Ex) 05Sep13 .docx

obligations hereunder, at any time or from time to time without notice to the other party, provided that the assigning party shall provide the other party with written notice as soon as practicable.  Supplier agrees that Distributor's Affiliates may purchase Products from Supplier under the same terms and conditions set forth in this Agreement and be entitled to the other rights of Distributor set forth herein

**Section 7.07.**     **Notices.**  Any notice and similar communications concerning this Agreement ("Notice") shall be in writing, and shall be either:  (i) delivered in person; (ii) sent to the other Party by certified mail with return receipt requested; (iii) sent by recognized overnight courier; or (iv) sent by facsimile, electronically confirmed.  Notices shall be delivered or sent to the Parties' respective addresses set forth below or at such other address as either Party may hereafter establish by notice given in the manner prescribed in this paragraph.  A Notice shall be considered given when delivered.

Notices to Distributor shall be addressed to:

| | | |
|---|---|---|
| Brightpoint Distribution, LLC | With | Brightpoint, Inc. |
| 501 Airtech Parkway | copy | 501 Airtech Parkway |
| Plainfield, Indiana 46168 | to: | Plainfield,  Indiana  46168Attention:    General |
| Attention: President | | Counsel |
| Fax No.: (317) 707-2601 | | Fax No.:  (317) 707-2514 |

Notices to Supplier shall be addressed to:

| | | |
|---|---|---|
| Jawbone | With | _____ |
| 99 Rhode Island Street, 3ʳᵈ Floor | copy | _____ |
| San Francisco, California 94103 | to: | _____ |
| Attention:_____ | | Attention:_____ |
| Fax No.: _____ | | Fax No.:  _____ |

If either Party changes its address during the term hereof, it shall so advise the other Party in writing and any Notice thereafter required to be given shall be sent by certified mail to such new address.

**Section 7.08.**     **Execution In Counterparts.**  This Agreement may be executed in one or more counterparts, each of which, whether an original, facsimile or scanned PDF sent via email, shall be deemed to be an original, but all of which shall constitute the same agreement.

**Section 7.09.**     **Effect of Headings.**  The headings to the Articles, Sections and Exhibits of this Agreement shall not affect the construction of this Agreement.

**Section 7.10.**     **Attorneys' Fees.**  If either Party commences any action or proceeding against the other Party to enforce this Agreement, the prevailing Party in such action or proceeding shall be entitled to recover from the other Party reasonable attorneys' fees, costs and expenses incurred by such prevailing Party in connection with such action or proceeding and in connection with enforcing any judgment or order thereby obtained.

**Section 7.11.**     **Governing Law; Venue; Consent to Personal Jurisdiction.**  This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York without regard to any conflict of law principles of any jurisdiction to the contrary.  Any civil action based upon, arising out of, or in any manner connected with this Agreement, its breach, or any of the transactions contemplated by this Agreement shall be commenced in and determined by one of the federal or state courts in New York, New York, Borough of Manhattan.  Each of the Parties to this Agreement: (i) irrevocably and unconditionally consents and submits to the *in personam* jurisdiction of such courts in any such action; (ii) consents to service of process in accordance with the rules governing proceedings in any such court; and (iii) irrevocably waives and covenants not to assert any objection to the laying of venue in any such court in any such action.

**Section 7.12.**     **Compliance with Laws; Noncontravention.**  The Parties shall at all times conduct their efforts under this Agreement in strict accordance with all applicable national, federal, state and local statutes, laws, regulations, rules, ordinances and judicial or governmental agency orders ("Laws") and with the highest commercial standards and be solely responsible for obtaining their respective permits, licenses, certificates and the like necessary for them to perform their obligations arising under this Agreement.  Supplier shall ensure that all Products at all times comply with all indispensable requirements necessary for sale and use in the Territory.  In particular, Supplier shall ensure that all Products comply with applicable rules on CE marking in the Territory, as well as applicable type approvals.  Supplier shall complete all processes for obtaining applicable approvals and making necessary notices to authorities.  Each Party shall bear its own costs arising out of this process. Supplier shall make copies of declarations of conformity (DOC) documents shall be made available to Distributors and its Affiliates upon request. Any approval by Distributor or its Affiliates of packaging or Products shall not relieve Supplier of any of its above obligations and shall not be considered as a waiver by Distributor or its Affiliates.

*CONFIDENTIAL & PROPRIETARY*
*COPYRIGHT, UNPUBLISHED, BRIGHTPOINT, INC.*
*The language contained in and the format of this agreement shall not be copied or duplicated, in whole or in part, either identically or substantially similar expression, without the express written consent of BrightPoint, Inc.*

Jawbone Distributor Agmt IMM FINAL (Ex) 05Sep13 .docx

Each Party represents and warrants that neither the execution and delivery of this Agreement by such Party, nor the consummation by it of the transactions contemplated hereby will constitute a violation of, or be in conflict with, constitute or create a default under, or result in the creation or imposition of any liens or encumbrances upon any of its property pursuant to: (i) its charter documents or bylaws, each as amended to date; (ii) any agreement or commitment to which it is a Party or by which it or any of its properties are bound or to which it or any of its properties are subject; or (iii) any statute or any judgment, decree, order, regulation, or rule of any court or governmental authority relating to it.

**Section 7.13.**     **Press Releases.**  Each Party may publish press releases and other marketing material/announcements regarding the relationship contemplated in this Agreement.  Each Party shall allow the other Party an opportunity to review and approve the other Party's press release, marketing materials and/or announcements (or relevant portion thereof) at least two (2) business days prior to their release.  Neither Party shall otherwise make any public announcement about this Agreement or the Parties' discussions without the written consent of the other Party, which consent shall not be unreasonably withheld or delayed.  Either of the Parties may at any time make announcements which are required by applicable law, regulatory bodies, or stock exchange or stock association rules, so long as the Party so required to make the announcement, promptly upon learning of such requirement, notifies the other Party of such requirement and discusses with the other Party in good faith the exact wording of any such announcement.

**Section 7.14.**     **Third Party Beneficiaries.**  The Parties hereby acknowledge and agree that Distributor's customers shall be deemed express and intended third-party beneficiaries of those provisions of this Agreement that expressly confer a right upon Distributor's customers, including, without limitation, Section 5.01 (Indemnification) and the limitations, conditions and terms associated therewith (collectively, the "**Customer Beneficiary Terms**").

**Section 7.16.**  **Insurance.**  Supplier will, at its own expense, and at all times during the term of this Agreement and for one year thereafter provide and maintain in effect the insurance policies and minimum limits designated below, and any other insurance required by law, with insurers with an A.M. Best's insurance rating of A-:VIII or better. The insurance requirements herein are in addition to and separate from any other obligation contained in this Agreement and shall not act to limit or relieve either party of any obligations contained in the Agreement, including but not limited to defense and indemnity obligations.

(a)  Commercial General Liability Insurance.  Commercial General Liability insurance covering all operations by or on behalf of Supplier arising out of or connected with this Agreement, providing coverage for bodily injury, property damage, personal and advertising injury, products liability, completed operations liability, and contractual liability, with a minimum per occurrence limit of $5,000,000 and annual aggregate limit of $5,000,000. Such insurance shall include Distributor, its Affiliates, and their respective officers, directors, shareholders, employees and agents as additional insured entities for Distributor, and such insurance shall apply as primary insurance to, and without a right of contribution from, any and all other insurance maintained by or otherwise available to Distributor or Supplier or their respective Affiliates.

(b)  Workers' Compensation Insurance and Employer's Liability Insurance.  Workers' compensation will be provided as required by and in accordance with the applicable laws in the states, territories or provinces having jurisdiction over as applicable, Supplier's employees.   Employer's liability insurance will be provided with a minimum limit of $1,000,000.

(c)  Automobile Liability Insurance.  Supplier will carry Comprehensive Business Automobile Liability insurance, including coverage for bodily injury and property damage for owned, non-owned and hired vehicles with a minimum limit of $1,000,000 per accident.

(d)  Errors and Omissions Liability (Professional Indemnity) Insurance.   Supplier will carry insurance for Errors and Omissions Liability (Professional Indemnity) with a minimum limit of $2,000,000 per occurrence or per claim and in the annual aggregate, covering negligent acts, errors or omissions and wrongful acts.  Such insurance will include coverage for the following risks: a) liability arising from theft, dissemination and/or use of confidential and proprietary information stored or transmitted in electronic form, and b) liability arising from the introduction of a computer virus into, or otherwise causing damage to, a customer's or third-party's computer, computer system, network or similar computer-related property and the data, software and programs stored therein, with a minimum sublimit of $2,000,000 per occurrence or per claim.

(e)  Within a reasonable time after signing this Agreement, and within a reasonable time after renewal or replacement of coverage for the duration of the Agreement and as otherwise specifically required above, Supplier will provide Distributor with Certificates of Insurance evidencing the required coverage. The certificates must note that the insurers issuing coverage shall endeavor to provide the additional insured Party with at least thirty (30) days' prior written notice of cancellation or non-renewal of coverage or as otherwise allowed by policy conditions. Such certificates will specifically confirm Distributor's additional insured status, the primary and non-contributory status, and the required waiver of subrogation.  Supplier's failure to provide certificates of insurance in compliance with the insurance requirements herein, or Distributor's failure to receive certificates, shall not limit or relieve

**CONFIDENTIAL & PROPRIETARY**
**COPYRIGHT, UNPUBLISHED, BRIGHTPOINT, INC.**
*The language contained in and the format of this agreement shall not be copied*
*or duplicated, in whole or in part, either identically or substantially similar*
*expression, without the express written consent of BrightPoint, Inc.*

Page 10 of 18

Jawbone Distributor Agmt IMM FINAL (Ex) 05Sep13 .docx

Supplier of its obligation to comply with the requirements set forth above or constitute a waiver of the requirements herein.

7.16.1    Distributor agrees to carry the following types of insurance coverages:

(a)  Workers' Compensation Insurance and Employer's Liability Insurance. Workers' compensation will be provided as required by and in accordance with the applicable laws in the states, territories or provinces having jurisdiction over Distributor's employees.  Employer's liability insurance will be provided with a minimum limit of $1,000,000.

(b)  Errors and Omissions Liability (Professional Indemnity) Insurance.  Distributor will carry insurance for Errors and Omissions Liability (Professional Indemnity) with a minimum limit of $2,000,000 per occurrence or per claim and in the annual aggregate, covering negligent acts, errors or omissions and wrongful acts.

**[SIGNATURE PAGE FOLLOWS]**

IN WITNESS WHEREOF, the Parties have caused this Agreement to be duly executed by their duly authorized representatives.

"DISTRIBUTOR"

BRIGHTPOINT DISTRIBUTION, LLC

Date:___September 12, 2013___

By:_____

Print:___Bashar Nejdawi_____

Its:_____President_____


"SUPPLIER"

Aliphcom

Date:___9/16/13___

By:_____

Print:___Melinda J Mount_____

Its:___President_____

CONFIDENTIAL & PROPRIETARY
COPYRIGHT, UNPUBLISHED, BRIGHTPOINT, INC.
The language contained in and the format of this agreement shall not be copied
or duplicated, in whole or in part, either identically or substantially similar
expression, without the express written consent of BrightPoint, Inc.

Page 12 of 18

Jawbone Distributor Agmt IMM FINAL (Ex) 05Sep13.docx

**EXHIBIT "A"**
**DISTRIBUTOR PRODUCTS AND PRICING**

Products Pricing will be documented with Quarterly Term Sheets signed by duly authorized representative of each party.

***CONFIDENTIAL & PROPRIETARY***
***COPYRIGHT, UNPUBLISHED, BRIGHTPOINT, INC.***
*The language contained in and the format of this agreement shall not be copied or duplicated, in whole or in part, either identically or substantially similar expression, without the express written consent of BrightPoint, Inc.*

**EXHIBIT "B"**
**TERRITORY**

For purposes of this Agreement, the Territory shall consist of the United States of America and its territories.

**Customers will be documented with Quarterly Term Sheets signed by duly authorized representative of each Party.**

*CONFIDENTIAL & PROPRIETARY*
*COPYRIGHT, UNPUBLISHED, BRIGHTPOINT, INC.*
*The language contained in and the format of this agreement shall not be copied or duplicated, in whole or in part, either identically or substantially similar expression, without the express written consent of BrightPoint, Inc.*

**EXHIBIT "C"**
**TRADEMARKS**

For purposes of this Agreement, each of the following shall constitute a Trademark:

https://jawbone.com/legal/trademark

*CONFIDENTIAL & PROPRIETARY*
*COPYRIGHT, UNPUBLISHED, BRIGHTPOINT, INC.*
*The language contained in and the format of this agreement shall not be copied
or duplicated, in whole or in part, either identically or substantially similar
expression, without the express written consent of BrightPoint, Inc.*

**EXHIBIT "D"**
**QUARTERLY TERM SHEET**
For purposes of illustration and not limitation:

**Term Sheet – Ingram Pricing Q3 2013**

Term Sheet – Ingram Pricing Q3 2013 ("Term Sheet") by and between ALIPHCOM DBA JAWBONE, a California corporation with offices at 99 Rhode Island, 3rd Floor, San Francisco, CA 94103 USA ("Jawbone") and **Brightpoint Distribution, LLC**, an Indiana limited liability company, with its principal place of business at 501 Airtech Parkway, Plainfield, Indiana 46168 ("Distributor"). This Term Sheet is effective from July 1, 2013 to September 30, 2013.

This Term Sheet, including any Exhibits and documents referred to in this Term Sheet or attached hereto, constitutes the entire and exclusive statement of agreement between the parties with respect to the subject matter and it replaces any prior or contemporaneous oral or written communications between the parties with respect to the subject matter herein. There are no conditions, understandings, agreements, representations or warranties, express or implied, which are not specified herein. This Term Sheet may only be modified by a written document executed by the parties hereto.

Except as modified herein, all other terms and conditions of the copy of the Distributor Agreement executed and effective as of August XX, 2013 ("Agreement"), remain in full force and effect. If there is any inconsistency between this Term Sheet and the Agreement, the terms of this Term Sheet shall govern, but only as to the subject matter herein.  The Agreement applies to all quotations made and purchase orders accepted by Jawbone and is an integral part of the sales contract between Jawbone and Distributor. Whenever this Agreement conflicts with or is expanded or added to by any terms and conditions of Distributor's purchase order, this Agreement shall govern and supersede the terms and conditions of Distributor's purchase order and any conflicting, additional or other terms on Distributor's purchase order will be disregarded. Jawbone's failure to object of provisions contained in any communication from Distributor shall not be deemed a waiver of this Agreement.

| | |
|---|---|
| **Pricing:** | Exhibit A |
| **Authorized Customers:** | Exhibit A |
| | |
| | Only authorized brick and mortar customers and their on-line sites are authorized. |
| | Except as otherwise expressly allowed under the Parties' Agreement, neither Distributor nor any customer of Distributor shall resell Products on any internet website including but not limited to EBAY, Amazon or other on-line auction or resale site, or outside Distributor's authorized territory. Breach of these obligations is a material breach and Jawbone shall be entitled but not obligated to terminate the Agreement immediately upon the discovery of such breach. |
| **Un-Authorized Channels:** | For non-authorized channels and territories, addendums to this Term Sheet must be executed as they are approved and established. |
| **Authorized Territories:** | USA |
| **Freight Terms:** | Standard per the Agreement |
| **Delivery Destination:** | Standard per the Agreement |
| **Transfer of Title/ Risk of Loss:** | Standard per the Agreement |
| **Marketing Development Funds:** | Jawbone will not provide Marketing Development Funds |
| **Inventory Price Protection:** | Standard per the Agreement |
| **Warranty:** | |
| **Returns:** | For customers listed in Exhibit A as eligible for returns, returns are allowed for purchases from an Authorized Reseller by a |

*CONFIDENTIAL & PROPRIETARY*
*COPYRIGHT, UNPUBLISHED, BRIGHTPOINT, INC.*
The language contained in and the format of this agreement shall not be copied
or duplicated, in whole or in part, either identically or substantially similar
expression, without the express written consent of BrightPoint, Inc.

Jawbone Distributor Agmt IMM FINAL (Ex) 05Sep13 .docx

consumer and returned by the consumer pursuant to the Authorized Reseller's standard return policy.

Eligible product can be returned to Jawbone for up to fifteen (15) months from the date of purchase. Purchase date will be verified by the serial number on the unit. Only Jawbone goods will be accepted.

Jawbone must authorize a RMA prior to returning the goods to Jawbone.

**Return Documentation:** For authorized customer returns, Distributor must provide documentation from their end customer that the return is from them, the date and the quantity.

**Stock Balancing and Rotation:** Standard per the agreement.

**Sell Through Reporting:** Distributor must provide "Sell Through" Reporting and current inventory levels on a weekly basis.

**Transshipment:** Distributor will not sell, rent, lease, or otherwise distribute any Products (i) for resale other than by the Authorized Resellers, (ii) for export outside of the Territory, either directly or indirectly, or (iii) either through the Internet or direct mail order or telephone sales.

**Deductions From Payment:** No deductions from invoice. In the event any provisions of this Term Sheet between Distributor and Jawbone requires that Jawbone to grant credits to Distributor's account, Jawbone shall grant such credit to Distributor's account. Distributor may not issue debit memos to Jawbone or otherwise deduct from or offset against any amounts due from Distributor to Jawbone, without the prior written consent of Jawbone of which written consent may be given by electronic mail.

## Exhibit A

| Authorized Reseller | ICON HD Purchase Order Price | Returns | ERA Purchase Order Price | Returns | JAMBOX Purchase Order Price | Returns | ICON HD + NERD Purchase Order Price | Returns | BIG Purchase Order Price | Returns | UP Purchase Order Price | Returns | Mixxry Purchase Order Price | Returns |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Best Buy | $11.11 | Yes | $11.11 | Yes | $11.11 | Yes | $11.11 | Yes | $11.11 | Yes | $11.11 | Yes | $11.11 | Yes |

*CONFIDENTIAL & PROPRIETARY*
*COPYRIGHT, UNPUBLISHED, BRIGHTPOINT, INC.*
*The language contained in and the format of this agreement shall not be copied or duplicated, in whole or in part, either identically or substantially similar expression, without the express written consent of BrightPoint, Inc.*

Jawbone Distributor Agmt IMM FINAL (Ex) 05Sep13 .docx

**EXHIBIT "E"**
**WARRANTY**

https://jawbone.com/legal/warranty

***CONFIDENTIAL & PROPRIETARY***
***COPYRIGHT, UNPUBLISHED, BRIGHTPOINT, INC.***
*The language contained in and the format of this agreement shall not be copied or duplicated, in whole or in part, either identically or substantially similar expression, without the express written consent of BrightPoint, Inc.*